TURNER et al. *v.* ACKER et al.

Contract — Construction of — Context.

> The whole of a written contract will be looked to in construing it, and no matter how plain a literal reading of an instrument may be, it will not authorize a construction that will make the whole instrument an absurdity, or strike important clauses from the paper.[1]

Appellants filed their bill in the Chancery Court of Monroe county against appellees, J. M. Acker and A. S. Tubb and his wife, Mary E. Tubb, alleging that John R. Harris died in 1862

---

1

Contracts are to be construed, as nearly as possible, by the intention of the parties, to be gathered from the whole context, which is to be interpreted according to the reasonable sense of the words. Waddington *v.* Hill, 10 S. & M. 560.

Conditions in a contract which are insensible or impossible, are void, and the obligation remains absolute, if it be not for the doing of an illegal thing. But if any sense or certainty can be made of the condition, the contract and condition will both stand. Merrill *v.* Bell, 6 S. & M. 730.

A repugnant clause in a contract must be construed according to the object

intestate, leaving his wife, Mary E. Harris (now Tubb), and complainant's children his only heirs at law; that he owned a large estate, both real and personal, in Monroe county; that in November, 1862, his widow, Mary E. Harris, married A. S. Tubb, and in August, 1863, letters of administration were granted to her as administratrix of the estate of said John R. Harris; that in his lifetime, on November 8, 1860, John R. Harris executed a deed of trust on the land in controversy and a large amount of personal property to secure J. M. Acker an indebtedness of $40,000, evidenced by Harris' ten promissory notes of same date for $4,000 each, the first note due March 1, 1861, and one due on the first day of March of each succeeding year thereafter for ten years; that the condition of said deed of trust was that, if Harris should fail to pay any one of said notes at maturity, the trustee should sell at auction enough of said property to pay the note then due; that on the 13th day of October, 1865, J. M. Acker, A. S. Tubb and his wife, Mary E. Tubb, entered into a written agreement, which recited the provisions of the trust deed, and

and spirit of the instrument, and thus be made to yield to the general intent to be collected from all its parts. Heard *v.* Garritt, 34 Miss. 152.

A contract must be interpreted in the light of the circumstances and conditions under which it was entered into. Tufts *v.* Greenwald, 66 Miss. 360; 6 So. 156; Pratt *v.* Cotton Co., 51 Miss. 470.

In construing contracts of doubtful meaning, testimony is competent to show the relation of the parties to each other, and the subject, and the surrounding circumstances, as aids to the interpretation of the language employed, so as to ascertain the intent. Gillenwaters *v.* Miller, 49 Miss. 150.

Where a contract of doubtful meaning may be construed as valid or invalid, that construction will be adopted which makes it legal, and the burden is upon him who sets up the illegality to prove it. Wilkins *v.* Riley, 47 Miss. 306; Clay *v.* Allen, 63 Miss. 426.

Grammatical construction will not be allowed to override the manifest intent of an instrument. An agreement of counsel that "any and all testimony taken in another case may be used in this," is properly held to embrace a deposition taken in such other case, after the date of the agreement, it appearing that this was the construction acted on by the counsel when engaged in the cause. Saffold *v.* Horne, 72 Miss. 470; 18 So. 433.

The whole of a written instrument will be looked to in construing it. Though words are used in a particular part of a conveyance which, according to well-settled technical significance, imply a present grant, yet, if a consideration of the context shows that a different construction should be placed upon such words to meet the meaning in which they were employed, this will be done. Atkinson *v.* Sinnot, 67 Miss. 502; 7 So. 289.

that none of the notes had been paid, and that the trustee had been requested to take charge of said property and to sell it, which Tubb and wife were anxious to prevent, and that a dispute had arisen as to the amount then due Acker, which threatened litigation; and that, in consideration of the premises, it was agreed that Tubb and wife should deliver to Acker eighty bales of cotton, which was to be in full settlement of all debts due by said Harris' estate to Acker, and the notes were to be delivered up and cancelled.   The contract was made exhibit B to the bill, and is as follows:

"It is hereby agreed between the said J. M. Acker and the said A. S. Tubb and Mary E. Tubb, his wife, that the said Tubb and wife are to deliver to the said J. M. Acker, in the city of Aberdeen, immediately, eighty bales of cotton, weighing 500 pounds each. On the 1st day of January, 1867, the said Tubb and wife are to deliver to said Acker, in said city, twenty-five bales of cotton, weighing 500 pounds each, of middling cotton, and on the 1st day of January, 1868, twenty bales, of same weight and quality, at same place.

"The said Acker agrees, upon the delivery of the eighty bales aforesaid, that the property shall be sold under the said trust deed; that he will become the purchaser thereof, and will immediately thereafter convey the same to said Tubb and wife in fee-simple, with proper warranty of title.   *  .*   *   Upon the delivery of the eighty bales of cotton, all debts of said Acker against the estate of John R. Harris, whether secured by deed of trust or otherwise, are hereby satisfied, and are to be delivered up to said Tubb and wife by the said Acker, and they are to become personally responsible for the delivery of the twenty-five and twenty bales of cotton before provided for."

The bill further charges that, notwithstanding this explicit agreement that the Acker debt was to be fully paid off by the delivery of the eighty bales of cotton, said A. S. Tubb, desiring to secure the title to all of the property embraced in the said deed of trust to himself, and intending to deprive complainants, the heirs of said John R. Harris, of the title, colluded with said J. M. Acker and Mary E. Tubb to accomplish such purpose, procured it to be provided in said agreement that the trustee should sell the property, and that Acker should buy it at the sale and imme-

diately convey it to Tubb and wife, and they were to deliver to him the forty-five bales of cotton; that, in pursuance of this agreement, Tubb did, on the 30th day of October, 1865, deliver to said Acker the eighty bales of cotton, which belonged to the estate of said John R. Harris, which paid off all the debts due to Acker by the estate of said Harris, and that the ten promissory notes of John R. Harris were delivered to Mary E. Tubb, the administratrix of said estate, and that, in pursuance of said collusive agreement, the trustee in said deed of trust, at the request of Acker, did sell all of said land and other property at public auction on July 16, 1866, at which sale Acker became the purchaser of all the property for $8,000, and received a deed from the trustee to same; that on the same day he executed a deed to said property to A. S. Tubb and wife in consideration of the forty-five bales of cotton aforesaid; that the forty-five bales of cotton, which were raised on lands belonging to complainants and with stock and implements belonging to them, were paid to said Acker by Tubb and wife; that, fearing that the title to said lands attempted to be conveyed to him and his wife would be attacked, said A. S. Tubb, in order to further cover up the fraud, procured his wife to make a false report as administratrix of the estate of John R. Harris, to the effect that she had sold eighty bales of cotton belonging to said estate and applied the proceeds to the payment of the debt due to Acker; that on July 24, 1872, and on February 14, 1872, and on October 5, 1872, said A. S. Tubb and wife executed deeds of trust on the land in controversy to Davis & McFarland, and Acker & Haughton, and J. M. Acker, with provision for sale in case of default in the payment of the debts secured; that the land was sold under these deeds of trust, and were purchased by J. M. Acker and McFarland, who held the legal title; that the sale by the trustee to Acker in the first deed of trust was void, and the sale by Acker to A. S. Tubb and wife was also void and vested no title in them, and the several deeds of trust executed by A. S. Tubb and wife were void and vested no title in the trustee, and said Acker and McFarland acquired no title by the sale under them.

The prayer was that satisfaction be entered of record of the trust deed given to Acker by John R. Harris, and that all subsequent conveyances be cancelled as clouds on complainants' title;

or, if it should be held that the estate's property paid for the land, a trust be declared in favor of complainants.

A demurrer to this bill was sustained and the bill dismissed. From that decree complainants appeal.

APPEALED from Chancery Court, Monroe county, L. HAUGH-TON, Chancellor.

Affirmed, May 8, 1882.

*Attorneys for appellants, Murphy, Sykes & Bristow.*

*Attorney for appellees, J. M. Acker.*

Brief of Murphy, Sykes & Bristow:

The two questions of main importance here involved are, first, under a proper construction of exhibit B, in connection with the allegations of the bill, did the delivery of the eighty bales of cotton to Acker pay and discharge the trust debt? and, second, if it did, what effect did it have on the subsequent deed of the trustee to Acker, his deed to Tubb and wife, their subsequent trust deeds, the sale thereunder and the deeds to the purchaser? (The court will bear in mind that the trust deeds of Tubb and wife have no connection with the Harris trust debt or deed, but were made to secure long subsequent individual debts of Tubb.)

The first question should be easy of solution, if, as we now submit to the court, it is only another way of putting the question, does the agreement, exhibit B, *mean* what in the most unqualified and unmistakable language it *says?* Let us look at the circumstances and then at the language of the instrument.

On October 13, 1865, Acker held ten notes of John R. Harris, for $40,000 and interest, executed before the war and secured by trust deed on land, slaves, and personal property. The debtor has died, the war has swept away the slaves and personalty, and greatly diminished the value of the land. In addition to this, a controversy has arisen between the creditors and Harris' representatives as to the liability of the estate to pay a large part of said debt, which threatens to result in litigation. Under these circumstances, Acker and Tubb and wife enter into an agreement,

exhibit B; they recite therein, first, the provisions of the trust deed; second, that Acker has notified the trustees to enter and take possession of the property for the purpose of the trust, and that Tubb and wife are anxious to prevent this; that a controversy about the amount due has arisen which threatens to result in litigation, which all parties were anxious to avoid.

For *these purposes* it is solemnly agreed that Tubb and wife shall immediately deliver to Acker eighty bales of cotton in Aberdeen. The *effect* of this delivery is not immediately stated (the instrument being somewhat awkardly framed). Instead thereof, it goes on to provide how a deed to the land may be gotten to Tubb and wife, viz: The land shall be sold under the trust deed, Acker shall buy, and then convey to Tubb and wife by a warranty deed. The instrument then resumes as to the effect of the payment of the eighty bales. Upon delivery of the eighty bales, "all debts of Acker against Harris' estate, whether secured by deed of trust or otherwise *are hereby satisfied,* and are to be delivered up to be cancelled." For the forty-five bales, the consideration for Acker's warranty deed to them, Tubb and wife are held alone to a "personal responsibility." This is the contract contained in exhibit B. The bill avers that a few days afterwards the eighty bales of cotton were paid and the notes delivered up satisfied to Harris' administratrix. Was there anything else to be done to satisfy these notes according to agreement? It had provided that when the cotton was delivered the debt was satisfied and the notes were to be delivered up to be cancelled. The cotton *was* delivered, the notes *were* delivered up to the administratrix satisfied. The trust debt being satisfied, the mortgage was discharged *ipso facto,* and the title to the lands immediately vested in John R. Harris' heirs. Act of Feb. 11, 1860, Acts 1860, p. 415; Heard *v.* Baird, 40 Miss. 793.

*Nine months* afterwards the trustees sold under the (satisfied) trust deed. We ask the court if the heirs of Harris, if aware of their rights, could not have successfully enjoined this sale in a court of chancery? At the time of this sale *not a dollar* was due on the trust debt and the *notes therefor were in the administratrix's hands.* Can a stronger case be conceived of satisfaction and discharge? Notwithstanding this Acker bid the land in, and the same day conveyed the land, for the expressed consideration of

forty-five bales of cotton—twenty-five to be paid on January 1, 1867, and twenty on January 1, 1868, to Tubb and wife with covenants of warranty. We emphasize here the consideration and the warranty. Why? It may be asked why any reference is made in exhibit B to any cotton besides the eighty bales that paid the notes. If eighty bales cancelled the debt and effected the purpose for which the instrument was executed, why is it stated therein so particularly that twenty-five more bales are to be delivered January 1, 1867, and twenty bales January 1, 1868? The reason is plain. The forty-five bales were to be the consideration for Acker's warranty deed; and sure enough, when we come to look at that deed we find that exact consideration: Twenty-five bales of cotton to be paid January 1, 1867, and twenty to be paid January 1, 1868.

Again, it may be asked if the debt was to be paid by the eighty bales, why insert an agreement to have the land sold under the (satisfied) trust deed, purchased by Acker and conveyed by him *with warranty* to Tubb and wife? The truth is just about this: After the agreement for the compromise of the debt by the delivery of the eighty bales of cotton immediately, it occurred to Tubb (who had been Harris' overseer and had married his widow) that this payment of the notes would vest the title in Harris' heirs, his children. This did not suit so well. He was unwilling to deliver the eighty bales of cotton immediately as a payment *pro tanto on* the notes, and risk Acker's voluntary promise to buy at the trust sale, six months off, and then convey to him (Tubb) and wife without further consideration. So he *pays* the notes *in full* with the eighty bales, and then agrees to give Acker forty-five bales more if he will (notwithstanding the satisfaction of the trust deed), have the land sold, buy it himself, and then give Tubb and wife a deed with *full warranty*. Tubb could then rely on the warranty and could reasonably presume on keeping the Harris heirs in ignorance of the payment, or if they should at any time suspect anything of the kind, they would not be troublesome while their *mother* had a joint title to the land. Acker, to secure so much clear "make" in those needy times, would not be unwilling to risk a warranty, trusting in like manner that Harris' heirs would never trouble his grantees.

This is certainly a reasonable explanation. On any other

theory, why is it that the stipulation for a "proper warranty" of title is so prominent in the agreement, exhibit B? The court knows it is most unusual for parties under such circumstances to give a general warranty of title. Why should Acker do so remarkable and unusual a thing unless it was nominated in the bond and to be paid for liberally? On any other theory, why should this roundabout way be adopted, of Acker's buying at the trust sale and then conveying to Tubb and wife, when Tubb and wife could have purchased directly at the sale and saved the trouble of Acker's conveyance to them? The plain truth is, everything in the whole transaction, from the execution of the agreement, exhibit B, to Acker's warranty deed to Tubb and wife, shows that when Acker bought and conveyed the land, after the satisfaction of the trust debt, he was doing something he had no right to do, and all the parties well knew it. If any further proof of this were necessary it is abundantly furnished in the clumsy attempt, a short time after the sale under Harris' trust deed and Acker's conveyance to Tubb and wife, to cover up their tracks by the sham proceedings in the probate court, for the "shipment to Liverpool" of eighty bales of cotton, the report of its sale there, the application of the proceeds to Acker's debt, and the payment by the impoverished widow of the balance $50,000 *out of her own pocket!*

But counsel in the Chancery Court went into various elaborate "constructions" of exhibit B, to show that a pike-staff is not a pike-staff, but something else, and to explain how "satisfied and delivered up" does not mean "satisfied and delivered up," but really means "continued in full force and *not* to be delivered up."

In Troup *v.* Rice, 55 Miss. 278, counsel for appellant went into an equally elaborate (but much more reasonable) construction of a *will,* to show that the words "after *paying* me the $10,000 note" didn't mean "paying" the note, but only "accounting" for it. This court say very bluntly and emphatically, "The language of the will is too plain to *admit* of construction. It is awkardly and ungrammatically expressed and the sentence is written without punctuation marks, but it explicitly declares that the note is *to be paid.* No punctuation marks nor construction can make the will speak any other meaning. To make it speak other than this is not to *construe* but to *destroy* the language."

The language of exhibit B is stronger than the language of

Ewing's will, there is no awkardness or improper grammar in the sentence. It is clear, plain and perspicuous: "Upon the delivery of the eighty bales of cotton all debts of said Acker against said estate of John R. Harris, whether secured by deed of trust or otherwise, are hereby satisfied and are to be delivered up." If there were any doubt as to the meaning of these words, the parties to the agreement have emphatically construed it by their acts immediately afterwards. The cotton *was* delivered and the debts *were* satisfied and delivered up. How much stronger a case this is than the case of Ewing's will in Troup *v*. Rice. To make that case as strong as this we must suppose Mary and Susan Ewing to have been *parties* to the instrument which recites that the $10,000 note is to be *paid;* that the instrument was entered into for the *express purpose* of settling matters between themselves and their father; that it recited a $10,000 note; that it stipulated that the note was *to be paid;* and that immediately afterwards *they paid it,* and *took up the note.* What would this court have said if afterwards Mary and Sue had come into court and insisted on having their money back out of the estate because "to be paid" really meant "to be accounted for ?"

"The very idea and purpose of *construction* imply a previous uncertainty as to the meaning of the contract; for where this is clear and unambiguous there is no room for construction and nothing for construction to do. A court would not by construction defeat the express stipulations of the parties." 2 Parsons Contr., p. 500.

"Nor can we put words in a deed which are not there, nor put a construction on the words of a deed directly contrary to the plain sense of them." Id., p. 494, note.

"All latitude of construction must submit to this restriction, namely, that the words may bear the sense which by construction is put upon them. If we step beyond the line, we no longer *construe* men's deeds but make deeds for them." Gibson *v*. Minet, 1 Henry Bl. 569; 2 Parsons Contr., 496, note.

Even the intention of the parties cannot prevail against the plain meaning of the words. "A contract which the parties *intended* to make, but did *not* make, cannot be set up in the place of the one which they *did* make, but did not intend to make."

Let us now examine some of the *constructions* of exhibit B,

contended for by counsel. They contend that the whole object of exhibit B was to get the title of the land in Tubb and wife; that 125 bales of cotton was to be the consideration of the satisfaction of the trust deed; that the debt was to be continued in full force until after the sale under the trust deed, and that 125 bales of cotton was to be the consideration of Acker's conveyance and warranty to Tubb and wife. Now, we do not hesitate to say that there is not a single point in the above "construction" that is not most unmistakably negatived by the plain words of the instrument.

First—The object of the agreement, as stated therein, is to prevent a sale of the property under the trust deed, which is threatened by Acker, and to settle the difference between the parties as to the amount legally due on the debt and to prevent litigation in reference thereto. There is not a hint, in the preamble, of any question of securing a title to Tubb and wife. The preamble recites that the object of entering into the agreement is to *settle the debt* and *prevent a sale*.

Second—The instrument is most careful to state that eighty bales of cotton *alone* are to settle the trust debt. · It first provides that eighty bales of cotton are to be delivered immediately, then that forty-five bales more are to be delivered in the future. This makes in all 125 bales. But the instrument goes back then to the eighty bales and says "upon the delivery of the eighty bales" the debt is to be satisfied, and not only this debt but *all other* debts held by Acker against Harris' estate, whether secured by deed of trust or otherwise.

The eighty bales of cotton were delivered, and the notes taken up *two years* before the payment of the forty-five bales for which Tubb and wife were to only be "personally responsible." Mark the difference. The trust debt and deed are to be held open until the *eighty bales* are paid (which is to be done immediately), as a continuing security for their delivery. When *they* are delivered the trust debt and deed are to be satisfied, the security ceases and for the forty-five bales Acker simply takes the "personal responsibility" of Tubb and wife. What is the meaning or sense of this stipulation for "personal responsibility" if the trust debt and deed are to remain unsatisfied until this forty-five bales are paid? The eighty bales and the forty-five bales are thus distinctly separated and the instrument contains two distinct, separate and independent

contracts. The first, for a consideration of eighty bales of cotton, payable immediately, to satisfy the trust debt; the second for a consideration of forty-five bales, payable two years off, to make a deed to Tubb and wife with warranty of title, and both contracts have been carried out exactly in that way.

Third—Instead of the debt being "continued" or held open after the eighty bales are paid, it is distinctly stated that on the delivery of the eighty bales, which is to take place immediately, the notes are declared "satisfied" and are to be delivered up. The cotton *was* delivered immediately and the notes *were* delivered up, showing what the parties to the instrument thought of it.

Fourth—In Acker's deed to Tubb, the consideration is stated to be forty-five bales, payable exactly in the way prescribed in the agreement, which shows what the *parties* thought was the consideration for Acker's warranty deed, and what was the office of the forty-five bales. Doubtless, the warranty deed of Acker would not have been executed, if the eighty bales had not been previously paid, but this merely the *post hoc* and not the *propter hoc*. After the payment of the debt, Acker is willing to make a little speculation and give a warranty deed in consideration of forty-five bales more. Tubb is willing to go into the speculation and give forty-five bales for Acker's warranty deed. The *sole* consideration for the warranty deed is forty-five bales of cotton, twenty-five bales to be paid January 1, 1867, and twenty bales to be paid January 1, 1868.

Counsel cites the legal maxim that when in a deed *inter vivos*, clauses are repugnant and inconsistent, the earlier clause prevails. We admit the principle (with a qualification which we will presently state), but it can have no bearing here for several reasons.

First—In this instrument there are two separate, distinct, and independent contracts; the one for eighty bales to satisfy the debt, the other for forty-five bales to execute a warranty deed.

Second—The clauses are not repugnant nor inconsistent, Acker's agreement to give a warranty deed in fee-simple to lands bought by him at a sale under a satisfied trust deed may be of small use to his grantees, his warranty deed may convey them no good title, but it is not void, it is not illegal, his agreement to the contrary may be enforced in a court of chancery. A man may legally

contract to give a warranty deed to lands which he never owned; the uselessness of the contract does not affect its validity or legality.

But here Tubb and wife *did* get something by the deed. They got Acker's *guaranty* that if ever they were ejected by Harris' heirs or otherwise he would refund them the value of the forty-five bales of cotton with interest. Both stipulations in the instrument, the agreement to satisfy the debt for eighty bales, and the agreement to make a warranty deed for forty-five bales more, were legal; both were carried out strictly to the letter. The only difference was as to the effect—the one *did* satisfy the trust debt—the other *did not* convey any legal title to Tubb and wife.

Suppose a man contracts in writing in the same instrument with A and B to convey lands immediately to A, without warranty, and six months after to convey the same lands to B, with warranty. Would these clauses be repugnant? A and B both accept. A gets the title and B gets the warranty. Both get what they contracted for.

In this case Acker simply says, "Pay me eighty bales and I will satisfy the debt." It is done, the debt *is satisfied*. In the same instrument he says, "Promise me forty-five bales more and I will risk giving you a warranty deed to the land which I will cause to be sold under the satisfied trust deed, and buy." It is done; the warranty deed is made. Is there any repugnance or inconsistency here? He is doing something which may not benefit either party in the long run, but they "pay their money and take their choice."

Third—But under any fair construction of the principle cited by counsel, it will operate in our favor. The earlier clause in this instrument, the clause *to be first performed,* the only clause directly effectuating the expressed object of the agreement is the agreement to pay eighty bales of cotton in full satisfaction of the trust debt. To prevent a sale under the trust deed—to settle the amount due—to prevent litigation—it is stipulated that Tubb and wife shall immediately deliver eighty bales of cotton to Acker, in Aberdeen. The effect of this payment, stated in a subsequent part of the deed, will of course relate back, and in construing the instrument, be ranged along with the stipulation for the payment.

The clause for the delivery of the forty-five bales more and the execution of the warranty deed is *subsequent in order of statement,* has no connection with the expressed object of the instrument,

and is not to be performed until from six months to two years in the future. (Under the trust deed six months' notice of sale must be given.)

But suppose we are wrong, and the two clauses are repugnant and incompatible? The qualification of the rule which we have hinted is that the earlier clause prevails, "if the inconsistency be not so great as to avoid the instrument for uncertainty." 2 Parsons Contr., 513, and cases cited in note.

According to the argument and construction of appellee's counsel the two clauses are so wholly and utterly repugnant and inconsistent that the meaning of the instrument is left entirely uncertain. The whole instrument then falls to the ground. What is the result? We are left to the allegations of fact in the bill, whence it appears that on the payment of the eighty bales of cotton on October 30, 1865, the trust debt was delivered up satisfied to the administratrix of Harris. This is an absolute satisfaction *in pais,* and leaves nothing due on the trust debt for which a sale could be made. * * *

Brief of J. M. Acker:

After the close of the war, Acker for the first time attempted to assert his rights under the said trust deed, which attempt resulted in the execution of the exhibit "B" of the bill of complaint, which is the basis of all the woes of these complainants. It will be observed that the execution of that instrument was not a matter of choice with Acker. It was forced upon him by Tubb and wife when they refused to deliver to the trustee the property included in the trust deed. He got nothing by its execution which he was not entitled to under the deed of trust, but on the contrary surrendered a portion of his rights under the deed of trust, for under the deed of trust he, as *cestui que trust,* had a right to purchase at the trustee's sale, or not to do so, as might be convenient to him, and to sell to whomsoever he might see fit, and either for cash or credit, as might comport with his interest, whereas by exhibit B he was compelled to become the purchaser at whatever sacrifice of his pecuniary interest, for cash, and to sell to Tubb and wife at a specified price agreed upon and fixed by the terms of the exhibit B, and that on a credit of one and two years. This, it will be seen, was a great hardship on him and one which could have

been acceded or submitted to on no other hypothesis than that his debt was so great against the estate that in bidding for the land he could defy all outside purchasers.

The record shows the estate of Harris to be hopelessly insolvent at the time of the execution of exhibit B, when the property was taken possession of and advertised by the trustee. It shows that there were only eighty bales of cotton, and the land and stock and other property sold by the trustee on July 16, 1866, after having advertised the same for six months, and which brought at the said sale only the sum of $8,000. The eighty bales of cotton and the $8,000, the amount realized for the land and stock and grain, etc., represented the whole estate of John B. Harris, to pay a debt of nearly sixty thousand dollars.

What is the meaning of the instrument, exhibit B, and what construction will this court put upon it? It is a portion of the history of the country that at the time of the execution of the instrument the courts were partially closed, that cotton was bearing a high price, while land, owing to the destruction of the old labor system, was very cheap. Acker wanted the cotton and the other property embraced in the deed of trust, to apply the proceeds of the same to the payment of his debt. This was his legal right. Tubb and wife, being planters, wanted the land and stock out of which to make a living for themselves and children. Hence the interposition of the question of the freedom of the negroes, against the lawful and just demands of Acker, that they might extort favorable terms from him, and save something from the wreck for themselves, and the present complainant, which resulted in the execution of the instrument, exhibit B. The effect of the agreement was that Tubb and wife would interpose no litigation or trouble against the claims of Acker and would surrender the whole property, the cotton, the stock, the grain, the land, etc., to the trustee to be sold for his benefit, provided Acker would agree to become the purchaser of the same and immediately thereafter, convey the same in fee-simple to Tubb and wife with warranty of title, for the sum of forty-five bales of cotton, to be paid in one and two years, twenty-five bales on January 1, 1867, and twenty bales on January 1, 1868. To enable Acker to sell and convey to Tubb and wife the property in the deed of trust, it was necessary that it should be sold under the deed and that he should be-

come the purchaser at said sale of trustee. To bind the parties to comply with this contract, an instrument in writing was necessary under the statute of frauds, which contract is exhibit B to the bill. That exhibit, after reciting the premises, proceeds, "And, whereas, a difference having arisen between the said Tubb and wife and J. M. Acker, as to the payment of the amount of the purchase money of the negroes in the said deed of trust mentioned; the said Tubb and wife *insisting* that the amount of the purchase of the said negroes should be credited on the said notes on account of the recent action of the general government and the State of Mississippi in freeing the said negroes, and the said Acker insisting that the amount should not be so credited; and to reconcile and harmonize these difficulties and to prevent litigation in reference thereto, it is hereby agreed between the said Acker and the said Tubb and wife, that the said Tubb and wife are to deliver to the said Acker in the city of Aberdeen, immediately, eighty bales of cotton, weighing 500 lbs. each (if they should weigh less than 500 lbs. the said Tubb and wife are to make up the deficiency at the time of the delivery of the second lot of cotton hereinafter provided for). On the 1st of January, 1867, the said Tubb and wife are to deliver to the said Acker in the city of Aberdeen, twenty-five bales of cotton, weighing 500 lbs. each, of middling cotton, and on the 1st of January, 1868, twenty bales of middling, weighing 500 lbs. each, at the same place. And the said Acker *agrees* upon the delivery of the eighty bales of cotton aforesaid, that the property shall be sold under the said trust deed; that he will become the purchaser thereof, and will immediately thereafter convey the same in fee-simple to the said Tubbs and wife, with proper warranty of title. This consent for the sale of the property does not extend to the negroes, they having been emancipated, or to such property as has died or been consumed or otherwise disposed of, and the obligation to make title is to this extent and no more.

This is the written agreement between the parties. It is full and complete in itself, and is easily understood. It does not specify and particularize all the property that was to be sold by the trustees and purchased by Acker and deeded to Tubb and wife. It certainly did not mean the cotton on hand, the eighty bales to be delivered to Acker, but the other property on the place, as the

stock, farming utensils, and the real estate upon which Tubb and wife resided. We admit that the contract or instrument "B" is inartistically drawn, yet the meaning and intent of the parties is apparent, viewed from the standpoint of contemporaneous surroundings. Tubb and wife lived on the plantation. They did not want to leave it. They wanted a title; the title that was in the trustees, Reynolds and others. It was by the cultivation of the soil they made a living; they, therefore, required Acker to bind himself by a written agreement to make them a title to it for forty-five bales of cotton. Acker accordingly bound himself to make them a title to it and the other property on the place upon the delivery to him of eighty bales of cotton on hand, which for our present purpose is admitted to have belonged to the estate of Harris and subject to the deed of trust. He thereby agreed, that is by exhibit B, that he would have the said property sold under the deed of trust, that he would become the purchaser thereof, and convey the same with proper warranty of title to Tubb and wife immediately thereafter, for forty-five bales of cotton, to be paid by them in 1867 and 1868. That this was the agreement and the intent of the parties, their contemporaneous and subsequent acts most conclusively show. Acker required the immediate delivery of the eighty bales of cotton in the hands of Tubb and wife as a condition precedent to the purchase by him of the property at the trustee's sale, and the deeding the same to Tubb and wife for forty-five bales of cotton. By being thus the recipient of the eighty bales of cotton he avoided all the dangers of destruction of it, depreciation in value, loss by theft, etc. The eighty bales were delivered to him, the trustees advertised and sold the other property included in the deed of trust; Acker became the purchaser and immediately deeded the same to Tubb and wife with warranty of title as per agreement; they on their part being bound in the same instrument to pay to him forty-five bales of cotton in 1867 and 1868 for the property purchased by him at the trustees' sale for the sum of $8,000, being a loss to him of the difference between forty-five bales of cotton, the delivery of which was deferred till 1867 and 1868, and $8,000 in cash.

That the price Acker should be *compelled,* at the trustees' sale, to bid and pay, or account for (which turned out to be $8,000), and the sum that might be realized by him in the sale of the

eighty bales of cotton, was agreed by him to be received as a full satisfaction of his large claims against the estate of Harris, is palpably apparent. This was all, in fact, that the estate could pay him, for it exhausted the assets. The only effect that the contract B had upon his rights was to compel him to become the purchaser of the property sold, whether it might bring $8 or $18,000, and to deed it with warranty of title to Tubb and wife for forty-five bales of cotton, paid in one and two years, which was, as has been said, great injustice to him, and calculated to work manifest injury to him. But complainants have put a different construction upon the contract "B," and in order to enable them to do so, have seized upon its concluding portion, and by that, and the construction sought to be put upon it, they seek to set aside the true contract in its most fundamental provisions as understood and construed and carried out by the parties, and by it to establish a contract totally inconsistent with the real contract, and to create entirely new obligations, and to introduce elements subversive of the intention of the parties. The paragraph which is alluded to is the following, to wit: "Upon the delivery of the eighty bales of cotton, all the debts of the said Acker against the said estate of John R. Harris, whether secured by deed of trust or otherwise, are hereby satisfied, and are to be delivered up to the said Tubb and wife by the said Acker, and they are to become personally responsible for the delivery of the twenty-five and twenty bales of cotton before provided for, and the said Acker releases to the said Tubb and wife, all his right, title and interest to the negroes mentioned in the said deed of trust." It is admitted that this last paragraph is calculated to create, at first glance, some ambiguity in the contract, which the court will harmonize. The contract is full, complete, and intelligible without it. It has no place in it, as at that time understood, construed, and carried out by the parties. It is merely a direction of the disposition to be made of the evidences of debt held by Acker against the estate of Harris. Left out, and the eighty bales of cotton and the land and stock satisfied the debt of Acker, as if not satisfied, there was no law requiring the representatives of Harris' estate to apply their future earnings to pay to him any balance. It made no difference to the said estate, nor to Acker, at what time his claims were delivered up and satisfied, whether in 1865 or in 1868, as his connection with said estate

was dissolved upon the sale of the property by the trustees. This paragraph is and was but a confused effort to explain what was plain and practicable without it. The court will not now allow it to render the execution of the real contract *impossible* and to set aside and nullify all the acts done and performed by the parties to it, in conformity with their construction and understanding of it, which the construction of the complainants would certainly do. By contract "B," the delivery of the eighty bales of cotton by Tubb and wife impose upon Acker the obligation of having the property sold by the trustee, of becoming himself the purchaser, and of conveying it with fee-simple title to Tubb and wife. The complainants' construction defeats this sale and makes it void and fraudulent, and renders it impossible for Acker to comply with his obligation to make the deed in fee-simple to Tubb and wife for the forty-five bales of cotton to be paid by them. Now the court will look at the whole instrument together, and give it such a construction as will support all of its parts and uphold all the material provisions of the contract. Construction must be put upon the entire deed and not upon disjointed parts of it, and this rule of construction prevails both in law and equity. Words are not the principle thing in a deed, but the intent and design of the grantor, and the law commends the astutia, the cunning of the judge in construing words in such a manner as will best answer the intent.

The whole instrument must be considered in determining the meaning of its separate parts, so that if practicable harmony and congruity may be attained *ex antecedentibus et consequentibus*. If there be in a deed earlier clauses which are repugnant and inconsistent with the later ones, the former shall prevail, applies in proper cases. Goosey *v.* Goosey, 48 Miss. 218, and others.

But such an election will not be made between inconsistent covenants and clauses, if they be made to harmonize with the general purpose and scheme of the parties as derived from the whole instrument.

In the present case the sale of land and other property in the trust deed is first provided for, and is the leading idea and principle in exhibit "B." Without such a sale there would have been no necessity for that instrument, for if the delivery of the eighty bales of cotton was a full satisfaction of the debts of Acker against

the estate of Harris, all that was necessary to be done was to deliver the cotton and take up the notes, and all the balance was a work of supererogation.    *    *    *

OPINION.—CHALMERS, C. J. :

The true construction of exhibit B is, that the delivery of the eighty bales of cotton and the sale of the land, which, according to the terms of the contract was to follow immediately upon such delivery, were to satisfy and discharge all indebtedness due by Harris' estate to Acker.   Appellants put too much stress upon the words of *one* sentence in the agreement, ignoring the manifest meaning of the entire instrument.

No matter how plain the literal reading of a special clause of an instrument may be, it will not authorize a construction that will make the whole instrument an absurdity, or will strike other important clauses from the paper.   Such would be the effect of the construction contended for by appellants in this case.   It cannot be supposed for a moment that the parties intended that all the debts due by Harris' estate should be paid and satisfied by the reception of less than half of the amount due, and that the land should then be sold under the trust deed, without the existence of any debts for which it could be sold.   This would be a palpable absurdity.   Inasmuch, therefore, as there can be no question that a sale was stipulated to be made after the delivery of the cotton, it must be that the meaning is that it was the sale and the delivery of the cotton together which were to operate as a payment, and satisfaction of the mortgage.   Any other construction than this makes the provision for a sale an absurdity, and we cannot ignore the fact that a sale was contemplated and stipulated for.

*Decree affirmed.*